**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

CHRISTIAN LOUBOUTIN S.A. and
CHRISTIAN LOUBOUTIN,

        Plaintiffs,

      v.

SUEBSAK CHANTARUNGSRI A/K/A
SCOTT CHAN A/K/A LOOKSGREAT4EVER
D/B/A E SHOE WAREHOUSE; and E SHOE
WAREHOUSE, and SG TRADING, INC.
F/K/A FIRST COMPUTING SOURCES, INC.
D/B/A ESHOEWAREHOUSE.COM D/B/A E
SHOE WAREHOUSE; and JOHN AND JANE
DOES A-Z (UNIDENTIFIED); and XYZ
COMPANIES 1-10 (UNIDENTIFIED),

        Defendants.

X
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
X

CIVIL ACTION NO.: 5:09-CV-539-D

[FILED UNDER SEAL
PURSUANT TO 15 U.S.C. §
1116]

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EX PARTE**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER,**
**SEIZURE ORDER, ORDER RESTRAINING ASSETS, EXPEDITED**
**DISCOVERY ORDER, ORDER SEALING THE FILE, AND ORDER TO**
**SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

Plaintiffs Christian Louboutin S.A. and Christian Louboutin (collectively,

"Plaintiffs") hereby submit this Memorandum of Law in support of their ex parte

application for a Temporary Restraining Order, Seizure Order, Order Restraining Assets,

Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction, as

against Defendants Suebsak Chantarungsri a/k/a Scott Chan a/k/a looksgreat4ever d/b/a E

Shoe Warehouse (the "Individual Defendant"), E Shoe Warehouse, and SG Trading, Inc.

f/k/a First Computing Sources, Inc. d/b/a ESHOEWAREHOUSE.COM d/b/a E Shoe

Warehouse, John and Jane Does A-Z (Unidentified) and XYZ Companies 1-10 (Unidentified) (collectively "Defendants") based on an action for trademark counterfeiting, trademark infringement, unfair competition/false designation of origin, and trademark dilution arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq., as amended by the Trademark Counterfeiting Act of 1984, Pub. L. No. 98-473 (October 12, 1984), the Anti-Counterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153 (July 2, 1996), the Trademark Dilution Revision Act, Pub. L. No. 109-312 (Oct. 6, 2006), and the Prioritizing Resources and Organization for Intellectual Property Act of 2008, Pub. L. No. 110-403 (Oct. 13, 2008) (the "Lanham Act"), and for trademark infringement, trademark dilution, and unfair competition under the laws of the State of North Carolina and common law.

## I. INTRODUCTION

In recent years, an illicit multibillion dollar industry has developed in the United States involving the unlawful importation, manufacture, distribution, offer for sale, and sale of counterfeit products falsely bearing the trademarks of legitimate manufacturers. Plaintiffs, designers of world-famous, top-quality shoes and other luxury goods, have become victims of this illegal counterfeiting trade. Without Plaintiffs' consent or authorization, Defendants, operating from this Judicial District, offer for sale via the Internet, as well as retail locations in this District, sell, and ship counterfeit shoes bearing one or more of Plaintiffs' well-known trademarks (the "Counterfeit Products") throughout the United States, the State of North Carolina, and the World.

Defendants are not authorized and have never been authorized by Plaintiffs to manufacture, export, import, distribute, offer for sale, or sell goods bearing Plaintiffs' trademarks or to use Plaintiffs' trademarks in any way. Defendants' intentional

2

misconduct is causing, and will continue to cause, irreparable harm to Plaintiffs' reputation and goodwill and to Plaintiffs' rightful market position. Plaintiffs, therefore, respectfully request that this Court issue: (i) a temporary restraining order and preliminary injunction against Defendants enjoining the manufacture, importation, exportation, distribution, offer for sale, sale, or other use of the Counterfeit Products; (ii) an order of seizure for the Counterfeit Products to prevent the shipment, transfer, or delivery of any Counterfeit Products to unknown third parties; (iii) an order to restrict transfer of Defendants' assets to preserve Plaintiffs' rights to an equitable accounting; and (iv) an order for expedited discovery allowing Plaintiffs to inspect and copy Defendants' books and records relating to the manufacture, import, distribution, offer for sale, and sale of the Counterfeit Products, as well as Defendants' other unauthorized use of Plaintiffs' trademarks.

Plaintiffs request this relief ex parte because experience in other cases has shown that unless such orders are issued ex parte, Defendants will simply dispose of or hide the Counterfeit Products and the business records related thereto and disclaim any knowledge of the source of the Counterfeit Products.[1] In addition, experience in other cases has shown that, without the requested relief, neither this Court nor Plaintiffs will be able to prevent the disappearance or destruction of crucial evidence that would enable Plaintiffs to track the sources of the Counterfeit Products as well as interdict additional shipments en route. Plaintiffs are currently unaware of the location of Counterfeit Products that Defendants may be in the process of importing, exporting and/or distributing in the

---

[1] *See* Declaration of Harley I. Lewin, Esq., dated December 15, 2009, accompanying this Memorandum ("Lewin Dec."), ¶ 12.

United States and elsewhere[2]. To the extent that such goods and documents relating to them remain in the United States under Defendants' direction and/or control, it is of enormous importance that Plaintiff obtain this information immediately to minimize ongoing irreparable harm.[3] Plaintiffs believe based on investigation that Defendants have received recent shipments of Counterfeit Products and are geared up for selling them during the Holiday Season . Unless restrained, the Counterfeit Products are likely to be quickly sold.

In addition, Plaintiffs request an order restraining Defendants' assets so that Plaintiffs' right to an equitable accounting of Defendants' profits from sales of the Counterfeit Products is preserved. Such relief will ensure the availability of an equitable accounting and issuing the order on an ex parte basis will ensure Defendants' compliance with the order. Experience shows that defendants in these types of cases will ignore orders restraining assets if they are issued with prior notice and will claim ignorance of their responsibilities while simultaneously secreting their assets before an order is issued, thereby rendering a plaintiff's right to an equitable accounting meaningless.[4] Plaintiffs' proposed asset restraint, which has been refined over years of anti-counterfeiting litigation, protects the rights of all parties by providing Defendants with the ability to seek a modification on short notice and to make certain personal and/or business payments if they provide a specified accounting.[5]

Plaintiffs do not request this relief lightly. Plaintiffs have suffered irreparable injury. Without entry of the requested relief, Plaintiffs will continue to suffer irreparable

---

[2] *Id.* at ¶ 13.
[3] *Id.*
[4] *Id.*
[5] *Id.*

harm from Defendants' sale of the Counterfeit Products. Prospective purchasers and others will believe Defendants' inferior Counterfeit Products have been manufactured and are warranted by Plaintiffs, when in fact, they are not, and will continue to make purchases of the Counterfeit Products unless Defendants are restrained by this Court.

## II. FACTUAL BACKGROUND

### A. Plaintiffs' World Famous Trademarks and Products

Without much fanfare or heralded introduction, the red sole morphed from a simple outsole design into a world wide, globally recognized "statement" of fashion, style, and class. Perhaps because of its extraordinary visibility (it is very hard to miss visibly either in a store window or walking down the street) and/or the visibility coupled with it being featured on the feet of the celebrities of the world, especially those walking the "red carpet" at the Oscars and similar events around the World, identification of the "Red Sole" with Christian Louboutin brand simply exploded. As a result, Plaintiffs' uniquely trademarked shoes, the "ones with the bright red sole" became known to women at all levels, in all cultures and of all ages. It is, in short, for those who desire it, an "aspirational" product. Nothing in the fashion industry in recent times has reached such notoriety in such a relatively short period of time. The Red Sole Mark (defined below) today is instantly understood to be Christian Louboutin. This is precisely why the mark has been granted registered status by the United States Patent and Trademark Office.

Plaintiffs' products are among the preeminent symbols of luxury in the World. Plaintiffs have been engaged for many years in the business of designing, producing and marketing high-quality luxury women's designer footwear (collectively, "Louboutin Products") bearing Plaintiffs' trademarks, including its registered red sole trademark (the "Red Sole Mark") and the CHRISTIAN LOUBOUTIN trademark (collectively,

"Plaintiffs' Marks"), throughout the United States and elsewhere in the World.[6] Plaintiffs own the entire right, title and interest in and to their federally registered trademarks.[7]

In 1991, Plaintiff Christian Louboutin created the Christian Louboutin® brand of shoes and opened the first Christian Louboutin® boutique in Paris, France.[8] In 1992, Plaintiffs began to use the Red Sole Mark on the Louboutin Products.[9] Plaintiffs have continuously used the Red Sole Mark and other trademarks owned by Plaintiffs in connection with the Louboutin Products throughout the World since 1992.[10] Plaintiffs' shoes bearing the Red Sole Mark have become one of the most sought-after and recognizable brands of shoes in the United States and abroad.[11] The Red Sole Mark and the name Christian Louboutin are synonomous with glamour, luxury and style.[12] Plaintiffs' shoes are instantly recognizable based upon their distinctive red sole.[13] The red sole is as much a distinctive registered trademark, if not more so, than the name of the Plaintiffs themselves.[14]

Plaintiffs' shoes are commonly referred to as the celebrity's favorite or the celebrity's shoe of choice.[15] This is because they are regularly worn by numerous famous celebrities, fashion designers, and socialites, including Elizabeth Taylor, Oprah Winfrey, Halle Berry, Angelina Jolie, Salma Hayek, Jennifer Lopez, Sarah Jessica

---

[6] *See* Declaration of Hugo Marchand, dated December 15, 2009, accompanying this memorandum ("Marchand Dec"), ¶¶3-8.
[7] Complaint, Exhibit A annexed thereto; see also Marchand Dec. ¶ 9, and Exhibit A..
[8] Marchand Dec., ¶ 3.
[9] *Id.*
[10] *Id.* ¶ 4.
[11] *Id.* ¶ 5.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* ¶ 7 and Exhibit B.

6

Parker, Diane von Furstenberg, and Princess Caroline of Monaco.[16] For the past three years, Louboutin S.A. has topped the Luxury Institute's annual Luxury Brand Status Index and Plaintiffs' Goods have been named the Most Prestigious Women's Shoes for each of the past three years.[17]

Plaintiffs' continuous and broad use of the Red Sole Mark has expanded its renown and enabled it to achieve celebrity in the luxury goods market.[18] The Red Sole Mark is highly visible as a symbol of quality and status.[19] Indeed, the Red Sole Mark can be compared in visibility to Nike's "Swoosh" mark, Tiffany's particular shade of blue box, or Louis Vuitton's "LV" pattern and is perhaps, because of the bright red nature of the trademark, even more visible. Mr. Louboutin is the owner and Louboutin S.A. is the exclusive United States licensee of the entire right, title and interest in and to the Red Sole Mark, which is the subject of U.S. Registration No. 3,361,597 in connection the Louboutin Products.[20]

The Red Sole Mark and the Christian Louboutin® trademark have achieved secondary meaning in the marketplace by virtue of many years of continuous use in commerce, the extraordinary press and similar unsolicited press coverage as well as Plaintiffs' own selective promotional activities.[21] The recognition of this secondary meaning by the United States Patent and Trademark Office in accepting Plaintiffs' application to register the Red Sole Mark and its actual passage to registered status is abundant proof of the notoriety thereof. Plaintiffs have approached the development and

---

[16] *Id.*
[17] *Id.*
[18] *Id.* ¶ 8.
[19] *Id.*
[20] *Id.* ¶ 9 and Exhibit A.
[21] *Id.* ¶ 10 and Exhibit B.

7

marketing of all their products with a deep concern for design, artistry, workmanship, material quality and their projected image, goodwill and long-term growth.[22]  Plaintiffs' Products bearing the Red Sole Mark consistently set industry standards for quality, value, performance, style and durability.[23]  Plaintiffs maintain rigid quality control over the manufacture, sale and servicing of their products throughout the United States and the World.[24]  Plaintiffs also pride themselves on their commitment to customer service. Plaintiffs maintain strict quality control standards for all Louboutin Products.[25]  Plaintiffs inspect and approve all genuine Louboutin Products prior to distribution and sale.[26]

Plaintiffs, unlike others, are not engaged in multi-product branding.  They do not make, distribute or sell anything besides footwear and a limited number of related leather products.  Plaintiffs' business is highly focused in the narrow area of high end women's footwear.  Counterfeiting of such a high visibility mark thus has an enormous impact in the ability of Plaintiffs not merely to grow, but perhaps in fact, to survive.  Plaintiffs have thus undertaken a worldwide effort to uncover and stop those engaged in the sale of such counterfeits.  Defendants are a very visible group, present at retail, at flea markets, on the Internet, selling wholesale in large lots and retail direct, dealing in copies of Plaintiffs' products and trademarks.

All genuine Louboutin Products are distributed through a worldwide network of very carefully selected authorized Louboutin dealers.[27]  Plaintiffs consistently display the Red Sole Mark in their advertising.[28]  Plaintiffs' shoes appear on models in numerous

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* ¶ 12.
[28] *Id.* ¶ 13.

8

fashion shows and in fashion spreads featured in numerous magazines.[29] This, together with the legions of celebrities who are photographed wearing the Louboutin Products bearing the Red Sole Mark and other similar unsolicited advertising has resulted in widespread recognition of the Red Sole Mark and the Christian Louboutin brand.[30] As a result, Plaintiffs have enjoyed millions of dollars in sales of the Louboutin Products.[31] The public, customers, and the luxury goods industry have come to associate the Red Sole Mark with products of exceptional materials, style, workmanship and reliability, and come to recognize that products bearing the Red Sole Mark originate with Plaintiffs.[32]

Plaintiffs' reputation and distinctive image have been consistently developed across an expanding number of products in the United States and international markets. Plaintiffs' Red Sole Mark is among the World's most famous and widely-recognized brands, particularly in women's high end footwear.[33]

### A. Defendants' Illegal Activities

Plaintiffs, through their counsel and investigators, have thoroughly investigated Defendants' operations and have confirmed that Defendants have been knowingly and intentionally dealing in Counterfeit Products bearing the Red Sole Mark.[34] Defendants offer for sale and sell the Counterfeit Products via undisclosed retail locations in this District, and through direct sales, via the U.S. Mail and on the Internet via public auction sites, such as eBay.[35] Indeed, Defendants have multiple locations they use in connection

---

[29] *Id.*
[30] *Id.* ¶ 12 and Exhibit B.
[31] *Id.* ¶ 12.
[32] *Id.*
[33] *Id.* ¶ 14.
[34] Examples of the Counterfeit Products are described in the accompanying Declaration of Roman Khaykin, dated December 15, 2009, accompanying this memorandum ("Khaykin Dec"), and shown at Exhibit B annexed thereto.
[35] *Id.*

9

with their business at 109 Kilmayne Drive, Suite C, Cary, North Carolina 27511; 1631 NW Maynard Road, Suite 102, Cary, North Carolina 27513; 104 Wordsmith Ct., Cary, North Carolina 27518; 109 Fountain Brook Cir D, Cary, NC 27511-4470; and P.O. Box 5830, Cary NC 27512 (collectively, the "Premises")[36], and possibly elsewhere.[37]

At the direction of Plaintiffs' counsel, Plaintiffs' investigators purchased shoes from Defendants bearing the Red Sole Mark.[38] A representative of Plaintiffs examined one of Defendants' products and found it to be an unauthorized copy of Plaintiffs Red Sole Mark.[39] Defendants have also offered for sale to Plaintiffs' investigators a host of shoes that appear to be counterfeits bearing the Red Sole Mark and both in email and conversation confirm the products being offered have the Red Sole Mark [sic].[40] Defendants, throughout the process, have used aliases, multiple addresses, and all of the tools available to hide their true location and identity.[41] Only now, late in the negotiations with the Plaintiffs' investigator have Defendants confirmed their true identity (one which Plaintiffs had already determined and who are the Defendants named herein.)

Defendants falsely use the Red Sole Mark on and in connection with their Counterfeit Products and by doing so represent that their Counterfeit Products are made by, or under the authority of, Plaintiffs. In fact, Plaintiffs did not manufacture, inspect, or package the Counterfeit Products, and did not approve the Counterfeit Products for sale and/or distribution.[42] Defendants unquestionably know that the Counterfeit Products they

---

[36] *Id.* ¶¶ 13, 22, 23, and 24 and Exhibits F, M, N, and O.
[37] *See generally* Lewin Dec.
[38] *See generally* Khaykin Dec.
[39] Marchand Dec., ¶ 18.
[40] Khaykin Dec. ¶ 21 and Exhibit L .
[41] *See generally* Khaykin Dec.
[42] Marchand Dec. ¶ 17.

10

are selling are not genuine. Defendants' website boasts that Defendants sell "million buck look Red Sole Platforms" that will not "break[] your bank" and offers consumers the opportunity to get "the celebrity favorite high end designer Look without Spending $$$$."[43]

## II.   ARGUMENT

### A.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Once a violation of the anti-counterfeiting provisions of the Lanham Act is demonstrated, injunctive relief will readily issue. *See* Lanham Act § 34, 15 U.S.C. § 1116(d); *Sports Design & Dev., Inc. v. Schoneboom*, 871 F. Supp. 1158, 1165-66 (N.D. Iowa 1995). Courts base injunctive relief under the Lanham Act on the trademark owner's inability to control the quality and nature of the goods bearing its marks. *See generally Camel Hair and Cashmere Inst. of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979). In determining whether to grant a Temporary Restraining Order ("TRO") and/or Preliminary Injunction, the Courts in this Judicial District consider the factors set forth in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co. Inc.*, 550 F.2d 189 (4th Cir.1977) (en banc):  (a) the likelihood of irreparable harm to the movant absent the injunction; (b) the likelihood of the harm to the non-movant as a result of the injunction; (c) the plaintiff's likelihood of success on the merits of its claims; and (d) the public interest. *See Dockery v. Young*, No. 1:06cv370, 2006 U.S. Dist. LEXIS 83028, at *3 (W.D.N.C. November 14, 2006) (noting courts consider same factors on motion for temporary restraining order as considered on

---

[43] See Khaykin Dec. Exhibit B.

motion for preliminary injunctions). In the Fourth Circuit, the "irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

Injunctive relief should be granted by the Court if, after "balancing the first two factors, the balance tips decidedly in favor of the plaintiff" and "if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Asia Apparel, LLC v. Ripswear, Inc.,* No. 3:02-cv-469, 2004 U.S. Dist. LEXIS 29208, at *8 (W.D.N.C. Sept. 17, 2004) (explaining "if the harm to plaintiff greatly outweighs the harm to the defendant, then enough of a showing has been made to permit the issuance of an injunction."), citing *Blackwelder*, 550 F.2d at 195 (internal quotations omitted) .

### 1. Plaintiffs Have No Adequate Remedy At Law and Will Be Irreparably Harmed by Defendants' Sale of the Counterfeit Products In the Absence of Injunctive Relief

Irreparable harm exists, as a matter of law, where there is trademark infringement or dilution. *See Scotts Co. v. United Industries Corp.,* 315 F.3d 264,273 (4th Cir. 2002); *Asia Apparel, LLC v. Ripswear, Inc.,* No. 3:02-cv-469, 2004 U.S. Dist. LEXIS 29208, at *8 (W.D.N.C. Sept. 17,2004); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3rd Cir.1992) (finding that trademark infringement "amounts to irreparable injury as a matter of law"); *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 311 (D.NJ.1998) ("lost control of [one's] reputation and goodwill" constitutes irreparable injury). As detailed below, Plaintiffs have clearly shown a likelihood of success on the merits of their counterfeiting, infringement, and dilution claims. Plaintiffs likewise have shown the presence of irreparable harm if this Court does not enter a temporary restraining order and preliminary injunction against Defendants.

12

**2.**   **Defendants will Suffer No Harm Upon Entry of an Order Prohibiting Their Continued Unlawful Conduct**

In contrast to the harm to Plaintiffs in the absence of injunctive relief, the only harm to Defendants if this Court grants the relief requested would be purely monetary. Defendants have no legitimate interest in selling Counterfeit Products or otherwise using Plaintiffs' Red Sole Mark without Plaintiffs' permission. *See, e.g., M-T-Fine Corp. v. Samuels,* 69 F.2d 76,78 (2d Cir. 1934) ("Advantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed.").

Defendants' potential monetary harm is far outweighed by the irreparable harm to Plaintiffs' Red Sole Mark and to Plaintiffs' goodwill and reputation built through years of promoting and selling high-quality Louboutin Products. The disastrous long-term effects of unfettered infringement and counterfeiting on Plaintiffs' business, establishes that the harm to Plaintiffs substantially outweighs the harm to Defendants.

**3.**   **Probability of Success On the Merits**

When a plaintiff can show that the balance of harms "decidedly favors the plaintiff, he is not required to make a strong showing of a likelihood of success." *Maryland Undercoating Co., Inc. v. Payne,* 603 F.2d 477, 481 (4th Cir. 1979). The "success on the merits" factor does not require a plaintiff to demonstrate a greater than fifty percent chance that it will prevail on the merits. *Dataphase,* 640 F.2d at 113. Rather, an injunction is appropriate if any one of the plaintiffs' claims supports such relief. *See Metric & Multistandard Components Corp. v. Metric's Inc.,* 635 F.2d 710, 715 (8th Cir. 1980). Here, Plaintiffs are likely to prevail on the merits.

13

**a.** **Plaintiffs Are Likely to Prevail on Their Trademark Infringement Claims**

To succeed on a federal trademark infringement claim, a plaintiff must prove two factors: (1) ownership of a valid trademark, and (2) a likelihood of confusion between the registered mark and the alleged infringing use by the defendant. *See People for the Ethical Treatment of Animals, v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (identifying elements of claim for federal trademark infringement); *see also Microsoft Corp. v. Computer Service & Repair, Inc.*, 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004). Plaintiffs in the current case have satisfied both requirements.

**(i)** *Plaintiffs Have the Legal, Exclusive Right to Plaintiffs' Marks*

Through Plaintiffs' pleadings and accompanying declarations, Plaintiffs verify their ownership of a federal registration for the Red Sole Mark.[44] This registration is prima facie evidence of the validity of Plaintiffs' Marks, as well as Plaintiffs' exclusive rights to use Plaintiffs' Marks in commerce on or in connection with the goods specified in the registration certificates. *See* 15 U.S.C. § 1057(b); *Microsoft*, 312 F. Supp. 2d at 784. Plaintiffs have used, and are currently using, Plaintiffs' Red Sole Mark in commerce on or in connection with their sale of the Louboutin Products since as early as 1992, and plan to continue such use in the future.

---

[44] *See* Complaint, Exhibit A and Marchand Dec., ¶ 9.

14

**(ii)** *Consumers are Likely to be Confused as to the*
*Source of Defendants' Counterfeit Products*

Plaintiffs have demonstrated a likelihood of confusion as to the source of the Counterfeit Products. The Lanham Act protects against both confusion at the point of sale and post-sale confusion. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987); *see also Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996). Post-sale confusion refers to the "confusion of consumers other than direct purchasers, including observers of those wearing an accused article." *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993); *see also Polo Fashions*, 816 F.2d at 148. Where the goods are directly competitive, as here, "confusion is likely if marks are sufficiently similar." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:20 (4th ed. 2007).

In determining whether a likelihood of confusion exists, the Fourth Circuit considers seven factors: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the alleged infringer's mark; (3) the similarity of the goods offered under the marks; (4) the channels of trade in which the goods offered under the marks are sold (5) similarity of the methods of advertising used by both parties; (6) the intent of the alleged infringer; and (7) whether actual confusion has occurred. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *Synergistic Int'l., LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006). The Fourth Circuit has "distilled other factors that may be considered relevant to analyzing the likelihood of confusion, such as (8) the quality of defendant's product; and (9) sophistication of the consuming public." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996)

ME1 9400290v.1

(citations omitted). No single factor is dispositive. *See Pizzeria Uno*, 747 F.2d at 1527. In the instant case, analysis of these factors weigh heavily in Plaintiffs' favor.

(a)    *Strength of Plaintiffs' Marks*

The strength of a mark can be established by advertising, continuous use, and a significant amount of money generated in sales. *See Petro Stopping Centers, L.P. v. James River Petroleum*, 130 F.3d 88, 93 (4th Cir. 1997), *cert. denied* 523 U.S. 1095 (1998) ("The strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.") (internal quotation and citations omitted). Plaintiffs' continuous use of Plaintiffs' Red Sole Mark in connection with Louboutin Products since as early as 1992, combined with the unsolicited advertising of Plaintiffs and the Louboutin Products, and extensive sales throughout the World,[45] supports a finding that the Red Sole Mark is strong.

(b)    *Similarity of Plaintiffs' and Defendants' Marks, Their Products, Channels of Trade and Methods of Advertising*

The marks Defendants use on the Counterfeit Products are identical to the Red Sole Mark appearing on genuine Louboutin Products.[46] The Counterfeit Products are identical to the products sold by Plaintiffs (though of inferior quality), and thus directly compete with those of Plaintiffs. Indeed, the Counterfeit Products have clearly been designed and are being sold by Defendants to fool others into believing that they are genuine Louboutin Products.[47] In addition, both Plaintiffs and Defendants advertise and sell their competing goods over the Internet. *See Garden & Gun, LLC v. Twodalgals, LLC*, Case No. 3:08cv349, 2008 U.S. Dist. LEXIS 79982, at *17-18 (W.D.N.C. Aug. 21,

---

[45] *See* Marchand Dec. ¶ 10 and Exhibit B.
[46] *See generally* Khaykin Dec.
[47] *See id.*

16

2008) *See Garden & Gun, LLC v. Twodalgals, LLC*, Case No. 3:08cv349, 2008 U.S. Dist. LEXIS 79982, at *17-18 (W.D.N.C. Aug. 21, 2008) (noting "similar advertising and marketing techniques . . . contribute to a belief that . . . products are affiliated"). Thus, they are sold in the same channels of trade using the same methods of advertising. The second, third, fourth and fifth factors, therefore, favor Plaintiffs.

(c)    *Defendants' Intent*

Plaintiffs have shown ample evidence that Defendants clearly intended to trade on the goodwill of the Red Sole Marks. Statements on Defendants' eBay store page[48] show that Defendants' intent is to confuse consumers other than direct purchasers. The fact that Defendants' Counterfeit Products bear marks identical to Plaintiffs' Red Sole Mark in itself warrants an inference that Defendants intend to cause consumer confusion. *See Sea-Roy Corp. v. Parts R Parts, Inc.*, No. 98-1028, 1999 U.S. App. LEXIS 3383 (4th Cir. N.C. Mar. 4, 1999); *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990). Therefore, this factor also favors Plaintiffs.

(d)    *Actual Confusion*

Actual confusion is not required to establish a likelihood of confusion, but it is considered strong evidence that the marks are likely to cause confusion among consumers. *See Garden & Gun, LLC*, 2008 U.S. Dist. LEXIS 79982 at * 18 ("Actual confusion is not required in order to state a claim under the Lanham Act."); *see also AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. N.C. 1976). At present, Plaintiffs do not possess evidence concerning instances of actual confusion and this factor does not weigh in favor of either party. *See Garden & Gun, LLC*, 2008 U.S. Dist. LEXIS 79982 at * 18.

---

[48] *See id.* Exhibit B.

For the foregoing reasons, Plaintiff respectfully submits that there is a strong likelihood of consumer confusion.

### b.    Plaintiffs Will Likely Prevail on Their Dilution Claims

Plaintiffs will likely be successful on the merits of their trademark dilution claims as well. The Lanham Act prohibits the dilution of famous marks, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C. § 1125(c)(1). A mark is "famous" if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. 15 U.S.C. § 1125(c)(2)(A).

There is no doubt that, long before Defendants' acts complained of herein, Plaintiffs' Red Sole Mark had become strong, distinctive and famous in the marketplace. Factors such as the extent of advertising and publicity of the mark, the extent of sales of goods or services under the mark, the extent of actual recognition of the mark, and whether the mark is registered on the principal register, all are relevant to showing the famousness of a mark. *See id.* § 1125(c)(2)(A)(i)-(iv). Plaintiffs have shown that the Louboutin Products are the subject of repeated unsolicited advertisements and are regularly worn by celebrities.[49] As a result of this exposure, Plaintiffs have sold Louboutin Products bearing the Red Sole Mark throughout the World, and have achieved worldwide recognition.[50] The Red Sole Mark is the subject of a federal registration.[51]

For famous marks like the Red Sole Mark, the Lanham Act protects the marks from suffering from dilution by blurring or dilution by tarnishment. "Dilution by blurring" is defined as "association arising from the similarity between a mark or trade

---

[49] Marchand Dec. ¶ 10 and Exhibit B.
[50] *Id.*
[51] *See* Marchand Dec., Exhibit A.

name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). "Dilution by tarnishment" is defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* § 1125(c)(2)(C).

Such dilution is likely to occur in the instant case. The mark appearing on Defendants' Counterfeit Products is identical to that used on and in connection with Louboutin Products. Because Defendants are not authorized to use the Red Sole Mark in connection with the Counterfeit Products, Plaintiffs have no way of controlling the quality of the merchandise on which they appear, the quality of the packaging used or the quantity of the Counterfeit Products that Defendants inject into commerce. As a result, consumers are likely to make associations between the Red Sole Mark and Defendants' Counterfeit Products that will impair Plaintiffs' ability to use the Red Sole Mark to designate the source of authentic Louboutin Products and/or will harm the reputation of the Red Sole Mark through their association with products of vastly inferior quality. In either event, the value of the Red Sole Mark - and therefore Plaintiffs' reputation and goodwill - will be seriously damaged if Defendants' conduct is left unchecked.

### 4. A Preliminary Injunction is in the Public Interest

Plaintiffs respectfully submit that granting an injunction would benefit the public interest. The public has an interest in the enforcement of valid trademarks and the right not to be deceived or confused as the result of their infringement. *Asia Apparel, LLC,* 2004 U.S. Dist. LEXIS at *15 ("Protection of federally protected property interests in trademarks is in the public interest."); *see also Cmty. of Christ Copyright Corp. v. Miller,* 2007 WL 4333192, at *3 (W.D. Mo. Dec. 7, 2007); *United States v. Torkington,* 812 F.2d 1347, 1353 n.6 (11th Cir. 1987) ("Enforcement of trademark laws benefits consumers

19

even in cases where there is no possibility that consumers will be defrauded. For, to the extent that trademarks provide a means for the public to distinguish between manufacturers, they also provide incentives for manufacturers to provide quality goods").

Plaintiffs have invested substantial effort and expense in developing, promoting, marketing, advertising, and protecting Plaintiffs' Marks and Plaintiffs' Products.[52] To allow Defendants to engage in unfettered copying would defeat the very purpose of the laws against infringement and unfair competition. Unless Defendants are enjoined, consumers are likely to mistakenly believe that Defendants' Counterfeit Products are the product of, associated with, or sponsored by Plaintiffs - at great cost economically and ethically to Plaintiffs and the consuming public alike.

## B. PLAINTIFFS ARE ENTITLED TO AN EX PARTE TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

This Court's authority to issue ex parte orders is specifically mandated by § 34 of the Lanham Act. 15 U.S.C. § 1116. To facilitate the preservation of evidence, the statute authorizes the ex parte seizure of "goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation."[53] 15 U.S.C. § 1116(d)(1)(A). Congress's purpose in providing for ex parte remedies was to ensure that courts are able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters served with a civil summons from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution.

---

[52] *See generally* Marchand Dec.

[53] For the purpose of § 34, a "counterfeit mark" is (1) a non-genuine mark which is identical to or substantially indistinguishable from a registered mark which is in use; (2) which is being used for the same goods and services as the accused mark; and (3) the accused use at the time of production is not authorized by the owner of the mark. *See* Lanham Act §§ 34(d) and 45; 15 U.S.C. §§ 1116(d). There is no question that this definition fits Defendants' Counterfeit Products.

20

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

Once a violation of the Lanham Act is demonstrated, the issuance of an ex parte seizure order is appropriate upon a showing that: (i) the person obtaining the order will provide adequate security; (ii) an order other than an ex parte seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant used a counterfeit mark; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendant, the defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court.[54] 15 U.S.C. § 1116(d)(4)(B).

In cases involving counterfeiting, like the case at hand, a preliminary injunction alone is insufficient. Without the remedy of an ex parte temporary restraining order and seizure, this lawsuit would be an exercise in futility. As one circuit court observed:

> Consistent with their calling, professional counterfeiters and dealers in counterfeit goods generally are not upstanding citizens. This presents a major obstacle to trademark owners trying to protect their marks.
>
> *     *     *
>
> Experience in hundreds of cases has shown that it is extremely likely that a counterfeiter, upon being apprised of the institution of

---

[54] A showing that similarly-situated defendants have in the past moved, hidden, or destroyed counterfeit goods in an attempt to avoid seizure is sufficient to meet this eighth requirement. *See* McCarthy on Trademarks and Unfair Competition (4th Ed.), § 30.37.

21

ME1 9400290v.1

> a lawsuit by the trademark owner, will conceal his infringing merchandise and either destroy or conceal all records relating to this merchandise, thereby frustrating implementation of the *trademark owner's statutory and common law rights.*

*Vuitton v. White,* 945 F.2d 569, 571 (3d Cir. 1991) (quoting Bainton, Seizure Orders: An Innovative Judicial Response to the Realities of Trademark Counterfeiting, 73 Trademark Rep. 459, 464 (1983)). The experience of Plaintiffs and Plaintiffs' counsel comports with this assessment.

Plaintiffs in the instant case have submitted evidence to show that Defendants manufacture, distribute, offer for sale, and sell counterfeit goods bearing the Red Sole Mark.[55] In the course of such transactions, Defendants have been shown to use false names and multiple other ruses to avoid detection.[56] If given notice, it is likely that Defendants will destroy or secret the Counterfeit Products and the books and records showing the manufacture and distribution of the Counterfeit Products.[57] If that occurred, Plaintiffs would suffer irreparable injury in that they would be denied access to the evidence establishing the liability of Defendants and the accounting of profits to which Plaintiffs are entitled. Such an injury to Plaintiffs would greatly outweigh the minimal potential harm to Defendants, who have no legitimate interest in continuing their criminal sale of the Counterfeit Products. Most importantly, if Defendants are given notice, there is a strong likelihood that they will destroy all evidence that may assist Plaintiffs in determining the source of, and in stopping the continuing manufacture, distribution, and sale of, these Counterfeit Products.[58]

---

[55] *See generally* Khaykin Dec.
[56] *See generally id.*
[57] *See* Lewin Dec. ¶¶ 11, 12 and 13.
[58] *See id.*

Without the remedy of an ex parte temporary restraining order and seizure, this lawsuit will be an exercise in futility. Courts comprehending the reality of the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue ex parte seizure orders.[59] It is thus respectfully submitted that an ex parte temporary restraining and seizure order is necessary to protect Plaintiffs' trademark rights and to prevent further harm to both Plaintiffs and the consuming public.[60]

### C. Plaintiffs Are Entitled to an Order Preventing the Fraudulent Transfer of Assets

The Lanham Act authorizes the award of an accounting of a counterfeiter's profits, a remedy in equity. 15 U.S.C. §1117. As such, a court has the inherent authority to issue an order restraining a defendant's assets so that a plaintiff's right to an equitable accounting is not later rendered meaningless through dissipation of the defendant's illicit proceeds pendente lite. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), aff'd 910 F.2d 552 (9th Cir. 1992).

---

[59] *See, e.g., Richemont International, S.A. v. Clarkson*, 07-sc-1641 (D. Minn. Apr. 2, 2007); *Cartier Int'l N.V. v. Jason B. Register, et. al.* 06 CV 00759-T-30 (TGW) (M.D.Fla. Apr. 26, 2006); *Antik Denim LLC v. Da Urban Hut et al.*, 05 CV 10077 (JFK) (S.D.N.Y. Dec. 12, 2005); *The North Face Apparel Corp. v. TC Fashions, Inc.*, 05 CV 9082 (S.D.N.Y. Oct. 25, 2005); *The North Face Apparel Corp. v. Reliance Dep't Store, Inc.*, 03 CV 9596 (BSJ) (S.D.N.Y. Dec. 3, 2003); *Cartier Int'l N.V. v. Sam Liu*, 02 CV 7926, 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003); *Fila U.S.A., Inc. v. Top Luxor Trading*, CV 98-5187 (CD. Cal. June 29, 1998); *Reebok Int'l Ltd. v. McLaughlin*, 89 Civ. 1739-T (S.D. Cal. Nov. 27, 1989); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521 (S.D. Cal. 1990); *Fila USA, Inc. v. Eidai Int'l*, 93-00837 (D. Haw. Oct. 29, 1995); *Reebok Int'l Ltd. v. Fair gulf Int'l Shipping & Trading, U.S.A., Inc.*, 93 Civ. 391 (W.D. Tex. Sept. 28, 1993); *Cartier Int'l v. Gorski*, 301 CV 1948 (PCD) (D. Conn. Oct. 17, 2001), cases attached to Lewin Dec. at Exhibit A.

[60] Plaintiffs undoubtedly satisfy all other requirements for a grant of ex parte relief under 15 U.S.C. § 1116(d)(4)(B). As set forth in Plaintiffs' [Proposed] Order filed herewith, Plaintiffs are willing to provide adequate security. Furthermore, Plaintiffs have not publicized the requested seizure. Lewin Dec. ¶ 18. Plaintiffs have also submitted evidence showing that the material to be seized is likely to be found at Defendants' Premises. *See id.* ¶ 10; Khaykin Dec. ¶¶ 13, 22, 23, and 24.

In *Marnatech*, the seminal trademark counterfeiting case, a district court granted Reebok a limited restraint of the defendant's assets for the purpose of preserving the same, thus ensuring the availability of a meaningful accounting after trial. 737 F. Supp. 1521. The Ninth Circuit affirmed the District Court's decision stating:

> Because the Lanham Act authorizes the district court to grant Reebok an accounting of [defendant's] profits as a form of final equitable relief, the district court has the inherent power to freeze [defendant's] assets in order to ensure the availability of that final relief.

*Marnatech*, 970 F. 2d at 559; *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) ("A court has the power to issue [injunctive relief] in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies."); *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 n. 10 (2d Cir. 1979) ("The framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court...[E]very means of preventing continuance of deceptive practices is proper.")

In the years since *Marnatech* affirmed the court's equitable power to grant the temporary restraint of assets, virtually all federal courts have exercised that power in counterfeiting cases similar to this one, including courts in this Circuit. *See, e.g., National Association for Stock Car Auto Racing, Inc. v. Does*, 3:08-cv-00044 (W.D.N.C. February 6, 2008).[61] Such a restraint is granted pursuant to Federal Rules of Civil Procedure Rules 64 and 65, under Sections 34 and 35 of the Lanham Act, and under the Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief. *See Levi Strauss*, 51 F.3d 982, 986-987; *Marnatech*, 970 F.2d at 558-61.

---

[61] Other orders granting a temporary restraint of a counterfeiter's assets are collected at Lewin Dec. ¶ 14.

ME1 9400290v.1

In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' activities and (3) that defendants may hide illegal ill-gotten funds if assets are not frozen. *Marnatech*, 737 F. Supp. at 1524, 1527.

As demonstrated above, Plaintiffs have met all of the prerequisites for an order temporarily restraining Defendants' assets. Plaintiffs have shown a strong likelihood of success on the merits of their trademark counterfeiting, infringement, and dilution claims, and will ultimately be entitled to an accounting of Defendants' profits from sales of Counterfeit Products as a form of final relief. Plaintiffs are incurring irreparable injury. Given their current deceptive practices, Defendants are likely to hide their assets absent an asset restraint, thereby rendering an accounting meaningless. Accordingly, the grant of an injunction restraining the transfer of Defendants' assets pursuant to the terms herein is necessary.

## D.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

District courts have broad power to permit expedited discovery allowing Plaintiffs to take early depositions and to require early document production in appropriate cases. *See* generally Fed. R. Civ. P. 30(b), 34(b). While the Fourth Circuit has not adopted a definitive test for granting expedited discovery, this Court has adopted a "good cause" standard, allowing expedited discovery where the moving party makes that request in connection with an application for a preliminary injunction hearing. *See Dimension Data North America, Inc. v. Netstar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005). The Court required that the discovery requests be narrowly tailored to obtain information related to the preliminary injunction application and that it will be irreparably harmed if the discovery is delayed. *See id.*

25

Plaintiffs have demonstrated good cause for expedited discovery. As demonstrated above, Plaintiffs are being irreparably harmed by Defendants' manufacture, importation, exportation, offering for sale, and sale of Counterfeit Products. Plaintiffs have learned of some aspects of Defendants' counterfeiting activities, including the bank at which Defendants maintain their business account. Plaintiffs have not been able, to date, to determine the Defendants' bank account number, the repository of the proceeds obtained by Defendants through other means, or the source of Defendants' Counterfeit Products. Plaintiffs, therefore, need to ascertain this information without delay. Only armed with that information can Plaintiffs seek to amend the Temporary Restraining Order and/or Preliminary Injunction to include other entities involved in Defendants' counterfeiting operation. If expedited discovery is not granted, the likelihood of ascertaining such information will decrease exponentially over time.

The expedited discovery requested in Plaintiffs' proposed order has been limited to include only what is essential for the Preliminary Injunction, including shipping, import, and export documents, lists of customers and suppliers, bank account and financial information, and other documents related specifically to Defendants' sale of Counterfeit Products. Furthermore, the proposed order includes a protective order regarding any documents seized or copied by Plaintiffs protecting Defendants from improper disclosure. Plaintiffs are unaware of any reason why Defendants cannot comply with these requests without undue burden.

It is clear that the need for Plaintiffs to obtain expedited discovery outweighs any conceivable prejudice to defendants. Accordingly, the request for expedited discovery should be granted.

26

## III. CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that this Court grant an order temporarily restraining Defendants from selling and distributing their Counterfeit Products or any unauthorized use of the Plaintiffs' Red Sole Mark, an order of seizure, an order for expedited discovery, and an order to show cause for preliminary injunction.

This ___ day of December, 2009.

J. Anthony Penry, NCSB# 8936
Neil A. Riemann, NCSB# 19258
Penry Riemann PLLC
510 Glenwood Avenue, Suite 319
Raleigh, NC 27603
andy.penry@penryriemann.com
neil.riemann@penryriemann.com
Phone: 919.833.9449
Fax: 919.833.9448

Harley I. Lewin
McCarter & English, LLP
245 Park Avenue, 27th Floor
New York, NY 10167
Tel: (212) 609-6800
Fax: (212) 609-6921

Appearing pursuant to Local Rule 83.1(e)

Irene M. Hurtado
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel: (973) 848-5371
Fax: (973) 297-3761

Appearing pursuant to Local Rule 83.1(e)

*Attorneys for Plaintiffs*
*Christian Louboutin S.A.*
*And Christian Louboutin*

27